**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| **Arvydas Urbonas** | ) | |
| and | ) | |
| **Dalia Urboniene,** | ) | **Bankruptcy Case No. 13-82754** |
| | ) | |
| **Debtors.** | ) | **Chapter 7** |
| | ) | |
| ———————————— | ) | **Adversary No. 14-96019** |
| | ) | |
| **Patrick S. Layng,** | ) | |
| | ) | |
| **Plaintiff** | ) | **Judge Lynch** |
| **v.** | ) | |
| | ) | |
| **Arvydas Urbonas** | ) | |
| and | ) | |
| **Dalia Urboniene,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the complaint by the United States Trustee objecting to the discharge of the Debtors under 11 U.S.C. §727(a)(2) and (a)(4). For the reasons stated below, the court sustains the objections raised in Counts I, III and IV of the complaint and denies the Debtors' discharge. Count II will be dismissed without prejudice as moot.[1]

## JURISDICTION

Discharge is a right that is expressly created by title 11 and would have no existence if not created by the Bankruptcy Code. Thus, proceedings on an objection to a debtor's discharge arise in a case under title 11. *See Kontrick v. Ryan*, 540 U.S. 443 (2004) ("Congress authorized

---

[1] For the reasons set forth below, the Debtors' oral motion for directed verdict (see also ECF No. 43) is denied. A separate order will be entered pursuant to this determination.

bankruptcy courts to adjudicate, *inter alia*, objections to discharge."). Therefore, this Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(J) in which this court has constitutional authority to enter final orders. *See, e.g., In re Yotis*, 521 B.R. 625, 631 (Bankr. N.D. Ill. 2014) (discharge "'stems from the bankruptcy itself,' and may constitutionally be decided by a bankruptcy judge") (citing *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011)).

## **PROCEDURAL BACKGROUND AND FINDINGS OF FACT**[2]

Doctors Dalia Urboniene and Arvydas Urbonas filed a voluntary joint petition under Chapter 7 of the Bankruptcy Code on August 7, 2013. With their petition they filed schedules and statements together with their declaration, signed by each of the Debtors on August 6, 2013 under penalty of perjury, attesting that they had reviewed the petition, statements, schedules, and other documents being filed and that the documents were true and correct. (ECF No. 2.)

Accompanied by their bankruptcy attorney, Drs. Urbonas and Urboniene were examined under oath by the Chapter 7 trustee at a meeting of creditors held on September 13, 2013. The Debtors each testified at the meeting that they had reviewed the petition and schedules attached to their petition before they were filed and that they were accurate and complete and included all assets, all debts and all income. When asked if there were any errors or modifications they needed to bring to the trustee's attention, each testified that there were none. They made no request for additional time or to amend schedules. Eleven days after the 341 meeting concluded, the case trustee filed her no-asset report. (ECF No. 16.)

Approximately one month later, on October 29, 2013, the U.S. Trustee filed a statement

---

[2] To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined elsewhere throughout this Memorandum Opinion.

that after review of documents and materials filed and submitted by the Debtors the U.S. Trustee

had determined that the Debtors' case "is NOT presumed to be an abuse under section

707(b)(2)." (ECF No. 21.)  The day after the U.S. Trustee filed this statement, the Debtors filed

their first of sixteen amended schedules and statements that would be filed on seven separate

dates over the next fifteen months.

Later on the same day, October 30, 2014, the U.S. Trustee moved to extend the time to

dismiss the case or object to discharge under Section 727. (ECF No. 26.) The court granted that

motion and the accompanying request for leave to subpoena the Debtors for documents and to

examine them under oath under Bankruptcy Rule 2004. (ECF No. 30.).

On January 2, 2014, the Debtors filed a second round of amended schedules and their

amended Statement of Financial Affairs (SOFA).  Six days later, on January 8, 2014, the Chapter

7 trustee moved for leave to retain a general attorney to represent the estate in this matter.  The

U.S. Trustee conducted 2004 examinations first of Dr. Urbonas and then of Dr. Urboniene on

January 15.  The Debtors' bankruptcy counsel, attorney Robert Benjamin and the Chapter 7

trustee were present at the examinations.  One week later, on January 22, 2014, the Debtors again

amended various bankruptcy schedules and their SOFA.

On February 7, 2014, the U.S. Trustee filed this adversary complaint objecting to the

Debtors' discharge pursuant to Sections 727(a)(2) and (4) for false oaths made in the Debtors'

schedules and at the 341 meeting and by Dr. Urbonas at the 2004 examination and for fraudulent

transfer or concealment of assets.  In their Supplemental Answer, the Debtors alleged, among

other things, that any alleged omissions that occurred in the bankruptcy filings were "innocent

errors caused by stress and concerns" about Dr. Urbonas' medical condition, and noted further

that English is not the Debtors' first language and that they had voluntarily supplemented their

schedules as "soon as [they] recalled certain additional information." (Adversary ECF No. 13.)

On March 12, the court granted the Chapter 7 trustee's request to conduct an additional Rule 2004 examination of the Debtors. The Debtors further amended certain schedules about one week before their second Rule 2004 examination. Following that, on May 23, the Debtors amended their Schedule D. On August 26, 2014, the Chapter 7 trustee filed a notice withdrawing her no-asset report together and filed her initial asset report and notice of claims bar date. (ECF Nos. 62, 63, 64.) Although the U.S. Trustee filed a final report on the bankruptcy case on December 29, 2014 (ECF No. 69), two weeks later, the Debtors filed a third amended Schedule B, followed, on February 3, 2015, by a fourth amended Schedule B, an amended Schedule C, a third amended SOFA and an amended Form B22A Statement of Current Monthly Income.

The court conducted a lengthy evidentiary hearing in this matter that concluded in March, 2015. Both Dr. Urbonas and Dr. Urboniene testified at trial, as did the Chapter 7 trustee, the president and the hospitalist director of CGH Medical Center, the center's employee health nurse, and a paralegal specialist from the Office of the United States Trustee.

Non-Disclosure of Assets, Transfers and Income

The U.S. Trustee objects to the Debtors' discharge on the basis of omissions and misstatements made in the schedules and statements that were also repeated and compounded by the Debtors' testimony at the Section 341 meeting of creditors on September 13, 2013.[3] The

---

[3] The U.S. Trustee also argues that Dr. Urbonas made an additional false oath during his examination under Rule 2004 on January 15, 2014, when he testified about his employment status as of the petition date. The falsity and intent of such statement is less clear than for the statements about assets, transfers and income. Because the court finds that both Debtors are clearly not entitled to a discharge based on their statements about assets, transfers and income in their schedules and Section 341 meeting testimony, the court need not reach the issue of whether Dr. Urbonas should also be denied a discharge based on his testimony about employment at the Rule 2004 exam. *See, e.g., Mass. Cas. Ins. Co. v. Roe*, 93 F.3d 323, 326 (7th Cir. 1996) (court did not need to decide whether author of a misstatement in application for insurance was acting as insurance company's agent since "such a finding would not change our ultimate conclusion on [insurance company's] alternate ground" that policy holder's own misrepresentation in back-dating another document independently voided the policy). As discussed below, however, the circumstances surrounding such testimony and his employment remain relevant to the credibility of the

U.S. Trustee objects that the omissions and misstatements were false oaths and also that they were intentionally made to conceal assets from the case trustee and creditors. The Debtors deny these allegations.

*Undisclosed Assets.*  The Debtors failed to list a number of their assets in the initial bankruptcy schedules and statements which they prepared and filed with the assistance of counsel.  There is no dispute that the Debtors' initial Schedule B failed to disclose Dr. Urboniene's deposit account at Swed Bank in Lithuania which as of the petition date had an approximate value of $2,535.00.  It did not list their savings account at Fifth Third Bank with a petition date balance of $50 or their $2,000 security deposit for their residential lease from James and Sherral Eshleman.  The Debtors' initial Schedule B also failed to list Dr. Urbonas's retirement account through CGH Medical Center valued at $289,891.35.  They did not list an anticipated interest in a $13,479.41 income tax refund for 2013, despite having received undisclosed income from which taxes were withheld in January 2013.  Further, it is now uncontroverted that the Debtors understated their equity in a 2008 Jeep Grand Cherokee valued at $15,000 in their initial filings.  Their initial Schedule D listed the balance of secured debt in the vehicle to be $13,587.00, although the actual petition date loan balance was $9,564.74.

*Undisclosed Income.*  The evidence received at trial shows that the Debtors' initial Schedule I failed to schedule Dr. Urboniene's right to receive a Lithuanian pension of approximately $207.42 per month, listing instead as her only income her $703 per month U.S. pension.  They also did not disclose in their initial Statement of Financial Affairs (SOFA) that she received $2,489.04 in Lithuanian pension payments for each of years 2011, 2012 and 2013.  Also, their initial Schedule I misleadingly described Dr. Urbonas as "Unemployed", leaving

---

Debtors as witnesses and as circumstantial evidence of their intent in making false statements about assets, transfers and income.

blank the response to the question seeking a description of "any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document." The Debtors' initial SOFA does not disclose $26,037.47 in gross income, or $13,384.46 in net income, from Dr. Urbonas' employer, CGH Medical Center, received on January 11, 2013. Instead the Debtors here list his income from employment from January 1, 2013 to July 31, 2013 to be "$0.00." Although the Debtors claim that the January payment was for work performed in 2012, they did not include it in the amount they scheduled as income for 2012, either.

They also failed to disclose health insurance that CGH Medical provided for the Debtors in 2013. As discussed in more detail below, Dr. Urbonas had an agreement with CGH Medical whereunder it would pay a total of $6,850.00 in health insurance premiums for the Debtors during Dr. Urbonas' hiatus from work from January 1 through May 31, 2013. Under this agreement, if Dr. Urbonas returned to CGH Medical on June 1, 2013 and worked for a full 12 months thereafter, the $6,850 would be forgiven and treated as income. If he did not, Dr. Urbonas would be obligated to repay that sum. The Debtors did not disclose this agreement in their bankruptcy schedules, either as income to Dr. Urbonas, as a debt to CGH Medical, or as an executory contract.

*Undisclosed Payments and Transfers*. In their initial Statement of Financial Affairs, the Debtors answered "none" in response to Question 7 seeking the disclosure of gifts made within one year preceding the petition date. They also marked "none" in answer to Question 10.a. which inquires about other transfers not in the ordinary course within two years preceding the petition date. In doing so, the Debtors failed to disclose $32,200 in cash gifts they had given within the year before the petition date to family members who were not living with them and who were not dependents. These payments included: (1) wire transfers of $1,000 on November

1, 2012 and $4,000 on November 7, 2012 to the Debtors' adult son Paulius Urbonas in the United Kingdom,[4] (2) wire transfers of $1,000 on August 31, 2012, $3,000 on October 22, 2012 and $9,000 on November 7, 2012, and a check for $600 on February 13, 2013 to Dr. Urbonas' adult son Jonas Urbonas in the United Kingdom, (3) a check for $5,000 to the Debtors' adult daughter Daine Jablonskyte-Marquez in Skokie, Illinois on December 8, 2012, (4) a check for $2,000 to the Debtors' adult daughter Lina Simanaitiene in Lithuania on December 22, 2012, (5) a check for $2,000 to Dr. Urbonas' mother Aldona Urboniene in Lithuania on November 30, 2012, and a payment of $800.00 in cash to her on May 3, 2013, (6) a check for $1,000 to Dr. Urbonas' sister Jurate Grinkeviciene in Lithuania on December 11, 2012, (7) a check for $1,000 to Dr. Urboniene's cousin Ieva Barakauskaite in Lithuania on February 8, 2013, and (8) a check for $1,000 to her brother Gediminas Cibiras in Lithuania on October 26, 2012, and gave him an additional $800.00 in cash on May 3, 2013. (ECF No. 79.) They also failed to disclose that Dr. Urboniene arranged for recurring automatic payments from the Lithuanian Swed Bank account to pay her brother Gediminas' utility bills of approximately $25 per month beginning in April or May 2013.

The Debtors disclosed in response to Question 9 of their initial SOFA that they had paid their bankruptcy attorney $3,000 on August 6, 2013, as payment for "consultation concerning debt consolidation, relief under the bankruptcy law or preparation of the petition in bankruptcy within **one year** immediately preceding the commencement of this case." They also disclosed that they had paid him $2,500 in June 2013, but did so in response to Question 3.c. rather than Question 9, which asks for "all payments made within **one year** immediately preceding the

---

[4] The amended Statement of Financial Affairs (ECF No. 79) states that Paulius lives in Lithuania, but both Debtors testified that he lives in the United Kingdom.

commencement of this case to or for the benefit of creditors who are or were insiders."[5]  They

did not disclose in initial SOFA, however, their additional $2,500 payment to attorney Benjamin

on November 2, 2012.  Attached to the petition was the Disclosure of Compensation of Attorney

for Debtor (Form B-203) signed by attorney Benjamin on August 7, 2013.  His disclosure

certified the full "compensation paid to me within one year before the filing of the petition in

bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the

debtor(s) in contemplation of or in connection with the bankruptcy case" was the $3,000 paid to

him pre-petition by the Debtors. (ECF No. 1.)  The disclosure omitted the $2,500 paid to him in

June 2013 or the $2,500 paid in November 2012.  A week after the petition was filed, Attorney

Benjamin filed a copy of a two-page written fee agreement dated August 6, 2013 and signed by

the Debtors providing for "an advance payment retainer in the amount of $3,000.00 and cost

advancement in the amount of $306.00." (ECF No. 10.)  The agreement made no reference to the

earlier payments, nor did he file a copy of any agreements predating August 6, 2013.

*Other Nondisclosure in the Schedules*.  In their original Schedule F, the Debtors also

failed to list $6,989.39 in medical debts to four medical providers.  Their response to Question

11 of the initial SOFA did not disclose that they had closed a Chase savings account on April 24,

2013 and a BMO Harris checking account on July 29, 2013. (ECF No. 79.)  They also failed to

indicate in response to Question 15 that they had moved to their current rented residence in

Sterling from a Chicago townhome within three years before the petition date.  Finally, their

response to Question 9 omitted the fact that they had paid $20.00 to CredAbility on May 31,

---

[5] "Insider" is defined by the Bankruptcy Code with respect to individual debtors to include a "(i) relative of the
debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general
partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. §
101(31)(A).  Although the statutory list of insiders is non-exclusive, *see In re Longview Aluminum, L.L.C.*, 657 F.3d
507, 509-10 (7th Cir. 2011), it is not readily apparent why the Debtors would believe that attorney Benjamin's law
firm was an insider.

2013 to obtain pre-petition credit counseling.

With attorney Benjamin present, Drs. Urbonas and Urboniene each testified under oath at the September 13, 2013 meeting of creditors that they had reviewed the petition and schedules attached to their petition before they were filed and that they were accurate and complete and included all assets, all debts and all income. When asked by the Chapter 7 trustee at the 341 meeting if there were any errors or modifications they needed to bring to the trustee's attention, Dr. Urbonas testified that "everything is correct." Dr. Urboniene testified that "no, there are no errors." When asked if they had met with an attorney within the prior two years, Dr. Urboniene testified that in June 2013 she had met with attorney Benjamin "for business purposes" and to discuss "what they should do in the future" considering her husband's heart attack. Neither she nor her husband disclosed that they had met with attorney Benjamin earlier in November 2012. At the 341 meeting they each testified that they owed a secured creditor at least $13,000 for their 2008 Jeep.

The Debtors

Dr. Arvydas Urbonas testified that he has been a physician for more than thirty years, first in Lithuania and then in the United States. He is currently licensed to practice medicine in Illinois, Wisconsin and Indiana. Dr. Urbonas testified that he is fluent in Lithuanian, Russian and English. He and his wife, Dalia Urboniene, were born in Lithuania. They married in 1996 and moved to the United States in 1997. Both were educated in Lithuania. Dr. Urboniene holds a PhD and practiced medicine in Lithuania for 23 years. While not licensed to practice medicine in the United States, Dr. Urboniene has worked here as a researcher, first at the University of Illinois at Chicago and most recently at the University of Chicago where she worked for 2½ years conducting cardiovascular research until her retirement in 2010. Although English is not

her first language, Dr. Urboniene was examined and testified in English in these proceedings without any evident need for a translator.

After coming to the United States, Dr. Urbonas also initially worked at the University of Illinois for some time and co-authored several articles in American medical journals with Dr. Urboniene. In 2007, Dr. Urbonas became board certified in internal medicine and began practicing medicine in the United States. He worked for a short period at an outpatient office in Wheeling, Illinois. After that, he worked continuously at CGH Medical Center in Sterling, Illinois, as a doctor specializing in hospital medicine from 2008 until September 2, 2014, with the exception of the 7 month gap in early 2013 that is partially at issue in this case. In June 2012, Dr. Urbonas' base salary at CGH increased from $230,000 to $255,000 per year. (Defs.' Ex. 10.) He earned a total salary of $440,221 in 2012 because of overtime and bonuses. From October 2, 2014 until at least the date of trial on February 24, 2015, he worked at St. Mary's Hospital in Janesville, Wisconsin.

The Debtors have five grown children. One lives in Lithuania, two in the United Kingdom, and two in the United States. Dr. Urbonas became a U.S. citizen in the summer of 2013, shortly before the Debtors filed for bankruptcy.

As of the petition date the Debtors lived in a residence at Sterling, Illinois, which they rented from James and Sherral Eshleman for $1,500 per month. The rent was due on the first of each month. The lease ran from October 1, 2011 through September 30, 2013. (UST Ex. 13.) They owned no real estate as of the petition date. Previously, they had owned and lived in a townhouse in Chicago from 2007 to 2011. However, in November 2012 they lost the townhouse to Aurora Loan Services in a foreclosure proceeding and a deficiency judgment of approximately $500,000 was entered against them.

Bankruptcy Planning and Transfers and Other Pre-Petition Events

Although Aurora Loan Services apparently had not taken any overt steps post-foreclosure to enforce its deficiency judgment against the Debtors, Dr. Urbonas testified that the entry of the judgment was stressful to him and his spouse.   On the recommendation of their foreclosure attorney the Debtors met with Robert Benjamin, the attorney who would eventually help them file their bankruptcy petition, in November 2012.  The Debtors paid attorney Benjamin $2,500 on November 2, 2012 by personal check. (UST. Ex. 21.)  On the memo line of the check, Dr. Urboniene wrote the words "ASSET PRESERVATION."

Less than two weeks after meeting with attorney Benjamin, Dr. Urbonas wrote a letter to CGH informing his employer that he wanted "to take a career [break] for a period of 5 months." (UST Ex. 14.)  Despite Dr. Urbonas' testimony that the Debtors met with attorney Benjamin because of their "concerns about a looming deficiency judgment," Dr. Urbonas wrote in the letter that he wanted to take a five-month break without pay to travel "to Lithuania multiple times" and "to go back to school and earn [an] MBA degree with health care concentration." (Id.)  Dr. Urbonas signed an agreement with CGH Medical for "a leave-of-absence beginning January 1, 2013 through May 31, 2013 in order to deal with personal/family issues." (Defs.' Ex. 12.)  The agreement stated that Dr. Urbonas would be provided health insurance during that five-month period for which premium he would be charged $6,850, but that such amount would be "forgiven (and considered income consistent with IRS guidelines) following a subsequent completed year of employment ending May 31, 2014." (Id.)  Also, within days after their meeting with attorney Benjamin, Dr. Urbonas and Dr. Urboniene spent $8,414 and $8,335 respectively to purchase $250,000 life insurance policies with significant cash surrender values, each naming the other as the beneficiary.

Shortly after meeting with attorney Benjamin the Debtors sent various cash gifts to relatives. They wired $1,000 on November 1, 2012 and $4,000 on November 7, 2012 to the Debtors' adult son Paulius Urbonas in the United Kingdom. On the latter date they also wired $9,000 to Dr. Urbonas' adult son Jonas Urbonas in the United Kingdom. They sent a check for $2,000 to Dr. Urbonas' mother in Lithuania, Aldona Urboniene, on November 30, 2012. Finally, the Debtors gave their adult daughter in Skokie, Illinois, Daine Jablonskyte-Marquez, a $5,000 check on December 8, 2012. These all are apparently gifts which the Debtors admit were given for no consideration. Also, on three occasions within one year of the bankruptcy petition, the Debtors issued checks or money transfers to Jonas Urbonas: $1,000 on August 31, 2012; $3,000 on October 22, 2012; and $600 on February 13, 2013. They wrote a check for $1,000 to Dalia's brother, Gediminas Cibiras, on October 26, 2012, as well as checks to Dr. Urbonas' sister Jurate Grinkeviciene ($1,000) on December 11, 2012, the Debtors' adult daughter Lina Simanaitiene ($2,000) on December 22, 2012, and Dr. Urboniene's cousin Ieva Barakauskaite ($1,000) on February 8, 2013. (Amended SOFA ¶ 7, ECF No. 79.) All of these persons were in Lithuania.

In the months after meeting with attorney Benjamin, the Debtors made other conscious attempts to protect their assets – even though no creditors were taking steps to collect from them at the time. On November 5, 2012, the Debtors prepaid their rent for December 2012, January 2013 and February 2013 by giving the Eshlemans a check for $4,500. On January 4, 2013, they paid the Eshlemans an additional $7,500 to prepay rent for March through July, 2013. Dr. Urboniene testified that "the first reason" for doing so "was to keep money away from creditors." They also prepaid loan payments for their 2008 Jeep by prepaying in a lump sum the payments for December 2012 through July 2013. In March 2013, the Debtors each paid $6,000 into their individual retirement accounts.

In 2012, Dr. Urboniene learned that she had become eligible for a Lithuanian pension when she turned 60 in 2010. She applied for the pension in August 2012. It took several months for her application to be processed. Once her application was accepted she received back payments extending back to 2010 as well as ongoing monthly future payments of approximately $207 per month. These payments were automatically deposited into an account she maintained at Swed Bank in Lithuania. From late April 2013 through early May 2013 Dr. Urboniene visited relatives in Lithuania. During her trip to Lithuania, she withdrew approximately $2,400 from the Swed Bank account, using $800 for her trip expenses and giving $800 to her mother-in-law and $800 to her brother. She also went to the bank to set up recurring automatic payments out of the Swed Bank account to pay her brother's utilities of approximately $25/month because he was unable to work.

On or about January 11, 2013, Dr. Urbonas received a paycheck of $13,384.46 ($26,037.47 gross, or $22,991.12 taxable gross) through electronic deposit for the two-week pay period from December 23, 2013 through January 5, 2013. (UST Ex. 18.) Of this, $16,200 was for a bonus based on work performed in 2012. $9,807.70 gross was for regular wages, although the January portion was apparently in error since Dr. Urbonas had taken an unpaid leave of absence beginning January 1, 2013. CGH Medical mistakenly paid him approximately $9,800 in gross wages every two weeks during the first eight to ten weeks of 2013 even though he was not working during that period. The Debtors noticed the overpayments in March 2013 and Dr. Urboniene physically went to a bank in Aurora to repay the salary overpayments in March 2013.

During his leave from CGH Medical beginning in January 2013, Dr. Urbonas took some online classes for a medical MBA program offered by Ohio University. He completed those classes in April 2013. However, he alleges that the classes took more time than he had expected

and that he decided not to continue with the two-year program. He alleges that he looked for openings for an entry level job in Hospital Administration in May 2013, but provided no proof to corroborate his own testimony. His testimony that he initially planned to complete the full two-year program is not consistent with the evidence that he asked for and signed documents for only a five to six month leave of absence from CGH Medical, nor is it consistent with the fact that he returned to CGH in a non-administrative physician position in August 2013. Instead, it appears that Dr. Urbonas intended to take a five to sixth month hiatus, significantly lessening the Debtors' income, during the six months before they commenced their Chapter 7 bankruptcy case in June or July 2013, and then to return to work at CGH Medical in mid- to late-summer 2013. Indeed, on May 31, 2013, the Debtors received pre-petition credit counseling necessary under Section 109(h) of the Bankruptcy Code in order to be eligible to file a bankruptcy petition. (ECF No. 5.)

However, on June 1, 2013, Dr. Urbonas suffered cardiac arrest while attending a conference with his spouse in Rosemont, Illinois. He testified that this was his first major cardiac incident since suffering a major heart attack in 1996 when he was 30, an episode he described as resulting in significant damage to his heart. During the June 3 heart attack he was taken by ambulance from the conference to a hospital where surgery was performed to implant an electronic device. Upon his release from the hospital on June 5 he underwent cardiac rehabilitation therapy which lasted approximately 3 weeks.

Dr. Urboniene met with attorney Benjamin in Chicago on June 3, 2013, while Dr. Urbonas was still hospitalized and less than 48 hours after his cardiac arrest. According to her testimony, she made the appointment that morning because she did not know whether her husband would survive and she was worried about the deficiency judgment. The Debtors paid

attorney Benjamin an additional $2,500 in connection with this meeting.

Dr. Urbonas' supervisor at CGH, Dr. Tran, testified that Dr. Urbonas called her on June 4 to inform her of his heart attack. She testified that Dr. Urbonas' "sabbatical" was originally supposed to be for 6 months and that he was originally expected to return to work at CGH on June 11, 2013. During the phone call, Dr. Urbonas informed her that his recovery might take two to three months. Dr. Tran suggested that if he wanted to apply for medical leave he should do so because the extension of the sabbatical was based on a medical condition. Corroborating this testimony are a June 17, 2013 email from Dr. Tran to Dr. Urbonas notifying him that CGH Medical had approved an extension of his leave from June 11 through September 2, 2013 (UST Ex. 29), a Family and Medical Leave Act designation notice for Dr. Urbonas dated July 12, 2013 (UST Ex. 27), and a certificate to return to work/be excused from work from June 19, 2013 through August 20, 2013, signed by Dr. Urbonas' physician. Additionally supporting Dr. Tran's testimony is an email that Dr. Tran sent Dr. Urbonas on July 31, 2013 to which she attached a preliminary schedule for CGH physicians. That document showed Dr. Urbonas was scheduled to return to work at CGH at least as early as September 3, 2013. (UST Ex. 30.) Considering Dr. Tran's testimony and these exhibits, Dr. Urbonas denials of having the conversation with Dr. Tran or requesting an extension of his leave are not credible.

On August 4, 2013, Dr. Urbonas experienced a cardiac arrhythmia that was corrected automatically within 6 seconds by the implant. He did not lose consciousness and did not seek medical care. Two days later, Dr. Urbonas and Dr. Urboniene met with attorney Benjamin. With the assistance of their bankruptcy counsel, the Debtors prepared and filed a voluntary joint petition under Chapter 7 and schedules on August 7, 2013. The Debtors paid attorney Benjamin an additional $3,000 on August 6.

Dr. Urbonas received a certificate from his physician after a physical exam on August 15, and returned to work at CGH on August 20, 2013. (UST Ex. 28.) Dr. Urbonas testified that he returned to work at CGH on August 20, 2013 in part because "not working was stressful to me – it is my nature that I need to work if I can." His salary and position at CGH were the same as before his leave of absence, but he was given a more regular schedule that did not include nights or overtime.

Investigation by the Trustees and Amendment of Schedules

As discussed above, on October 30, 2013, the day after the U.S. Trustee filed a statement of no presumption of abuse under Section 707(b)(2), the Debtors submitted the first of sixteen amended schedules and statements that they would file on seven separate occasions over the next fifteen months.

On October 30, 2013, the Debtors filed their amended Schedule F in which they added unsecured claims that totaled $1,356.47 for medical services. (ECF No. 22.) On January 2, 2014, the Debtors filed a second amended Schedule F, together with an amended Schedule B and SOFA. The amended Schedule F listed additional unsecured "Medical" claims: CGH Medical Center ($145.55); Northwest Pulmonary Association ( $45.00); Periodontics of Rockford Ltd. ($5,966.00); and Wendy L. Wells ($2,072.00). (ECF No. 32.) The amended Schedule B disclosed the Swed Bank account in Lithuania. (ECF No. 33.) In the amended SOFA, the Debtors listed as a payment to a non-insider creditor within 90 days before the petition (Question 3), their payment of $800.00 each to Aldona Urboniene and to Gediminas Cibiras in Lithuania on May 3, 2013. (ECF No. 34.)

They next filed amended schedules on January, 22, 2014, a week after the U.S. Trustee conducted the Debtors' 2004 examinations. Their amended Schedule E changed the priority

asserted with respect to a federal tax debt. (ECF No. 41.)  An amended Schedule I was filed that disclosed Dr. Urboniene's Lithuanian pension and the resulting increase in their total scheduled monthly income from $703.00 to $910.42. (ECF No. 42.)  The second amended SOFA also disclosed the Lithuanian pension paid for years 2011, 2012 and 2013, as well as the $2,500 paid in November 2012 to attorney Benjamin's firm.  The latter was listed under Question 3.c as a payment within one year of the petition "to or for the benefit of creditors who are or were insiders." (Id.)  In addition, the Debtors moved their entry of the May 3, 2013 $800 payments to Aldona Urboniene and Gediminas Cibras from the SOFA's Question 3 (payments to non-insider creditors) to Question 7 (cash gifts to family members within one year of the petition). (Id.) Finally, the second amended SOFA disclosed that the Debtors had closed a Chase savings account on April 24, 2013 and a BMO Harris checking account on July 29, 2013.

A second amended Schedule B filed on April 4, 2014, nearly two months after the U.S. Trustee commenced this adversary proceeding, first revealed that the Eshlemans held the Debtors' $2,000 security deposit while the accompanying amended Schedule G revealed the existence of the lease from the Eshlemans for October 1, 2013 to September 30, 2014. (ECF No. 52.) On May 23, 2014, the Debtors filed an amended Schedule D, reducing the listed amount of the claim of TD Auto Finance secured by their 2008 Jeep Grand Cherokee from $13,587 to $9,564.74. (ECF No. 56).  Included with this amendment was a lengthy disclaimer that the amendment was not "an admission that they knowingly sought to mislead the Trustee but for the purpose of memoralizing [sic] voluntary disclosures made by the Debtors to the Trustee subsequent to the filing of the petition for relief." (Id.)

The Debtors submitted yet another series of disclosures in early 2015.  On January 13, they amended Schedule B yet again to add their previously unscheduled savings account at Fifth

Third Bank with a petition date value of $50. (3d Am. Sched. B, ECF No. 74.)  Approximately

three weeks later, they filed a fourth amended Schedule B to reveal an interest in a CGH Medical

Center Employees Pension Plan worth $289,891.35.  Their accompanying amended Schedule C

claimed the entire interest in the plan as exempt as a retirement plan under 735 ILCS 5/12-1006.

(ECF No. 78.)  They also further amended their SOFA to add their payment for credit counseling

and the address of the Chicago townhouse where they lived from 2007 and 2011. (ECF No. 79).

Finally, they amended their Form B22A Chapter 7 Statement of Current Monthly Income and

Means-Test Calculation to disclose Dr. Urboniene's Lithuanian pension (increasing their total

current monthly income from $703.00 to $910.42). (ECF No. 80.)

## DISCUSSION

While one central purpose of the Bankruptcy Code is to offer debtors "a new opportunity

in life with a clear field for future effort, unhampered by the pressure and discouragement of

preexisting debt," such opportunity for a fresh start is limited to the "honest but unfortunate

debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (citing *Local Loan Co. v. Hunt*, 292

U.S. 234, 244 (1934)).  Thus, a Chapter 7 debtor is not entitled to a discharge if the debtor:

> with intent to hinder, delay, or defraud a creditor or an officer of the estate
> charged with custody of property under this title, has transferred, removed,
> destroyed, mutilated, or concealed, or has permitted to be transferred, removed,
> destroyed, mutilated, or concealed--
>
> **(A)**     property of the debtor, within one year before the date of the filing of the
> petition; or
>
> **(B)**     property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2).  Similarly, a debtor is not entitled to a discharge if the debtor "knowingly

and fraudulently, in or in connection with the case--(A) made a false oath or account...." 11

U.S.C. § 727(a)(4).  Under either subsection, the party objecting to discharge "must establish

grounds for denial of discharge under 11 U.S.C. § 727(a) by a preponderance of the evidence."

*Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011).

### A.  Section 727(a)(4) (False Oath)

To establish grounds to deny a discharge on the basis of a false oath, the U.S. Trustee must demonstrate that: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Id.* "A debtor's petition, schedules, statement of financial affairs, statements made at a section 341 meeting, testimony given at a Bankruptcy Rule 2004 examination, and answers to interrogatories all constitute statements under oath for purposes of section 727(a)(4)(A)." *Schaumburg Bank & Trust Co. v. Hartford (In re Hartford)*, 525 B.R. 895, 907-08 (Bankr. N.D. Ill. Mar. 2, 2015).  Omissions in bankruptcy schedules can constitute false statements under oath supporting an objection to discharge under Section 727(a)(4). *See, e.g., Skavysh v. Katsman (In re Katsman)*, 771 F.3d 1048 (7th Cir. 2014) (failure to schedule creditors, property jointly owned with ex-husband or alimony payments supported denial of discharge under Section 727(a)(4)).   Similarly, a debtor's testimony at a Section 341 meeting is "under oath," 11 U.S.C. § 343, and false testimony given during that examination may support an objection to discharge. *Schaumburg Bank & Trust Co. v. Hartford*, 525 B.R. at 908.

For purposes of an action under Section 727(a)(4), a fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011).  In this case, it is largely undisputed and the court finds that the Debtors made numerous material false statements under oath in their initial schedules, including the omissions of the Lithuanian pension, the pre-petition transfers to relatives, the

November payment to attorney Benjamin, the Swed Bank and other current and closed accounts, the lease and security deposit with the Eshlemans, and the true balance of the loan secured by the 2008 Jeep.   Many of these omissions were repeated and reaffirmed in both the Debtors' testimony at the 341 meeting.

Instead, the primary dispute between the Debtors and the U.S. Trustee is whether such omissions and misstatements were intentional.   The Debtors argue that they forgot about the omitted assets, income and transfers and that the omissions were therefore mere mistakes. Because fraud is rarely admitted, "[f]raudulent intent may be proven with circumstantial evidence." *Cantwell & Cantwell v. Vicario*, 464 B.R. 776, 789 (N.D. Ill. 2011) (citing *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)).   In an action under Section 727(A)(4), a "showing of reckless disregard for the truth is sufficient to prove fraudulent intent." *Stamat v. Neary*, 635 F.3d at 982.   Additionally, omissions need not be viewed in isolation. Even if a particular omission does not appear to be fraudulent, where "part of a larger picture of omissions and errors" the "cumulative effect of false statements may … evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent." *Id.* (citing *In re Duncan*, 562 F.3d 688, 695 (5th Cir. 2009)).

The Debtors, noting that they eventually corrected most of the omissions through amended schedules, argue that the omissions and misstatements were honest mistakes caused by stress over Dr. Urbonas' medical condition or by language problems.   However, all that is necessary is an intent to deceive, "which need not connote intending to obtain a pecuniary benefit." *Katsman*, 771 F.3d at 1050.   After weighing the testimony and evidence presented at trial, the court finds that the Debtors intentionally omitted assets, transfers and income in their bankruptcy schedules and in testimony at the Section 341 meeting.

First, the evidence shows that during the six to nine months before filing their petition, the Debtors engaged in conscious efforts to maximize the benefits they would receive from filing a petition for bankruptcy under Chapter 7. The Debtors' focused attention on their assets during this period and their related extraordinary actions such as their pre-payment of rent hardly support their self-serving testimony that they merely forgot about assets, income and transactions shifting assets during their several meetings with bankruptcy counsel or when they reviewed their schedules and statements during their successive filings. If anything, their repeated and prolonged failure to fully and accurately disclose assets in this case appears to be the continuation of their pre-bankruptcy strategy of keeping assets away from creditors and to prevent those pre-bankruptcy actions from being discovered and undone by the case trustee.

This is shown in part by the timing of their pre-petition acts. On November 2, 2012, on the recommendation of their former foreclosure defense attorney, the Debtors met with attorney Benjamin, an experienced bankruptcy attorney, and then spent the next six to nine months temporarily reducing income, converting non-exempt property into exempt property, pre-paying creditors and transferring property to family members. The purpose of this meeting is shown in the memo line of the check Dr. Urboniene gave to attorney Benjamin's firm in November 2012, where she wrote the words "Asset Preservation." Many of the Debtors' actions in November 2012 show not only that at that time the Debtors planned to file a future bankruptcy but that they planned to do so in the summer of 2013. It was only after Dr. Urbonas suffered a cardiac arrest in the beginning of June 2013 that they delayed their plans by several months.

For example, on November 12, 2012, less than two weeks after first meeting with attorney Benjamin, Dr. Urbonas asked his employer CGH Medical for a five-month leave of absence. Several days later, he signed an agreement with CGH Medical for a leave of absence

from January 1, 2013 through May 31, 2013, during which CGH Medical would continue to provide him with health insurance. The duration of his requested hiatus corresponds nearly perfectly with the six-month lookback period for the means test under Section 707(b)(2) of the Bankruptcy Code. The means test is designed "to measure debtors' disposable income and, in that way, to ensure that [they] repay creditors the maximum they can afford." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 71 (2011) (internal quotation marks and citation omitted).[6] Pursuant to Section 707(b)(2), an individual debtor's petition under Chapter 7 is presumed to be in bad faith if the debtor's average currently monthly income over the six months preceding the petition, with certain deductions, exceeds the maximum amount permitted under the statute. With a base annual salary of $255,000, gross income including bonuses and overtime of over $400,000 in 2012, and little secured debt, it appears that the Debtors would not have been able to pass the means test while Dr. Urbonas was working at CGH Medical. Taking a five to six month hiatus to take classes was a way to lower the Debtor's gross income in anticipation of a planned future bankruptcy filing while also providing an excuse for the decrease in salary and the opportunity to return to work after the petition was filed. Had the Debtors listed the income that they received in early 2013, disclosed the agreement with CGH Medical to provide health insurance during 2013 or indicated in Schedule I that Dr. Urbonas was reasonably certain to return to work at CGH Medical within a year, they risked inquiry about his employment status during early 2013 which might have resulted in the U.S. Trustee filing a motion to dismiss the case as being filed in bad faith.[7]

---

[6] In a Chapter 7 case, an individual's earnings from services performed post-petition are generally not property of the estate available for distribution to creditors, while in a Chapter 13 or 11 reorganization case they would be. *Compare* 11 U.S.C. § 541(a)(6) with 11 U.S.C. §§ 1306(a)(2); 1115(a)(2). In a Chapter 11 or a Chapter 13, an unsecured creditor whose claim is not to be paid in full can demand that an individual debtor devote all of his or her projected disposable income to the plan. *See* 11 U.S.C. §§ 1129(a)(15); 1325(b)(1).
[7] *See, e.g., In re Schwartz*, No. 15-1416, 2015 WL 4998443 (7th Cir. Aug. 24, 2015) ("[W]e agree that an unjustified refusal to pay one's debts is a valid ground under 11 U.S.C. § 707(a) to deny a discharge of a bankrupt's debts.").

The Debtors' other financial dealings in November 2012 further indicate their intent to file a bankruptcy and to maximize the assets they could retain in such a proceeding. Dr. Urboniene testified at trial that after the meeting with attorney Benjamin in November 2012 she and her husband pre-paid rent and car payments and withdrew thousands of dollars from their bank accounts for the express purpose of "keep[ing] it from creditors." During the same period of time, they also converted non-exempt funds into exempt assets, contributing $12,000 into their IRAs to increase those exempt retirement accounts by nearly 50% and spending over $16,000 to purchase life insurance policies with cash surrender values within days after meeting with attorney Benjamin.

The timing of these actions, too, is consistent with a plan to file bankruptcy six or more months later. Under Illinois' personal exemptions statute, property purchased "with the intent of converting nonexempt property into exempt property or in fraud of his or her creditors" is not exempt. 735 ILCS 5/12-1001. Similar to the 6-month lookback provision in the Bankruptcy Code's means test, the Illinois exemption statute includes a presumption that property "acquired within 6 months of the filing of the petition for bankruptcy shall be presumed to have been acquired in contemplation of bankruptcy." *Id.* The life insurance policies were purchased on November 9, 2012, and so the timing of this purchase is also consistent with a plan to file for bankruptcy in June or July of the following year, and thereby avoid the presumption that the conversion of non-exempt into exempt assets was in contemplation of the bankruptcy.

The Debtors also paid $26,200 in cash gifts to relatives during this same period, $13,000 of which was paid five days after meeting with attorney Benjamin. $21,200 of those cash gifts were paid to relatives who were overseas and therefore difficult to collect from. Because these transfers were for no consideration and occurred within two years of the bankruptcy petition,

they likely could have been avoided as fraudulent transfers by the Chapter 7 trustee under Section 548 of the Bankruptcy Code. To protect the family members that had received cash gifts from the Chapter 7 trustee, the Debtors failed to disclose all of the transfers in their initial schedules.

The circumstances presented at trial challenge the Debtors' testimony that they only considered bankruptcy after the June meeting with attorney Benjamin or that the impetus for filing was the two cardiac events in June and August 2013. Indeed, the evidence shows that testimony not to be credible. For example, the Debtors' certificate of counseling shows that they received the credit counseling required to be eligible to file for bankruptcy under Section 109(h) on May 31, 2013, the day before Dr. Urbonas' June heart attack and three days before Dr. Urboniene met with attorney Benjamin for the second time. The counseling date, however, came precisely at the end of the 5 month January through May hiatus described in Dr. Urbonas' November 2012 letter.[8] Similarly, Dr. Urbonas' testimony that in early 2013 he wanted to move into administration and did not intend to return to his job at CGH is not credible. His testimony that he only decided to quit the MBA program after struggling during the first semester is hardly convincing given that although he had enrolled in a two-year program he had only asked CGH Medical for a 5-month hiatus. Moreover, the agreement he signed with his employer clearly gives the impression that he would return to CGH Medical in five months at the same position.

---

[8] Given these circumstances, it is troubling that the Debtors' bankruptcy counsel has not filed a disclosure of compensation for the November 2012 and June 2013 payment as required by Rule 2016(b) or a copy of the written fee agreement in connection with such payments as required by Second Amended General Order No. 11-2. Even if counsel did not provide services directly related to a bankruptcy case in the first two meetings, the phrase "in contemplation of or in connection with" a case "has been broadly construed to encompass a variety of pre-petition legal services, even if not directly related to the bankruptcy filing itself." *In re Pawlak*, 483 B.R. 169, 180 (Bankr. W.D. Wisc. 2012); *Garcia v. Miller (In re Garcia)*, 456 B.R. 361 (N.D. Ill. 2011) (To determine if payments were made "in contemplation" of bankruptcy, courts must consider whether "the underlying professional services were rendered at a time when the debtor was contemplating bankruptcy."); *Brown v. Luker (In re Zepecki)*, 277 F.3d 1041 (8th Cir. 2002).

Even if he truly considered changing careers in November 2012, the weight of the evidence shows that he had abandoned that idea by the time the Debtors filed their bankruptcy in August 2012, less than two weeks before he returned to CGH Medical at the same position.

It is not particularly surprising that the Debtors delayed their planned bankruptcy when Dr. Urbonas was suddenly hospitalized in June 2013. A heart attack likely means additional medical bills, and if the Debtors waited until after his release and treatment when most of his medical expenses have been incurred, such bills would be pre-petition rather than post-petition debts and, therefore, likely dischargeable. When Dr. Urbonas' medical implant stabilized his arrhythmia in August 2013 without the need for medical treatment, it may well have signaled that the time was now ripe to file the bankruptcy petition.


Under the circumstances, the Debtors' excuse that they had forgotten about the assets, income and transfers that they omitted is not credible. These were not long-dormant accounts or transfers long ago. Dr. Urboniene visited Lithuania from late April through early May of 2013, only three months before they filed their petition. Not only did she withdraw funds from the Swed Bank account during that trip, but she also went to the bank to set up an automatic withdrawal to pay her brother's periodic utility bills.

Nor is it credible that Dr. Urboniene simply forgot about her Lithuanian pension. It is uncontroverted that she actively sought and received this pension within months, not years, of the bankruptcy petition. According to her own testimony, she applied for it in August 2012, and that she began receiving it several months later. Not long after that the Debtors met with attorney Benjamin.

Indeed, this occurred during a period when the evidence shows that the Debtors were

acutely focused on their assets and taking conscious steps to protect and preserve them. As discussed above, the majority of the large cash transfers to relatives occurred within days or weeks after the November 2012 meeting with attorney Benjamin. Although most of the checks and wire transfers were signed or originated by Dr. Urboniene, other than the two $800 cash transfers Dr. Urboniene made while in Lithuania, all of the other transfers to family members were from joint accounts with Dr. Urbonas at U.S. banks. Dr. Urbonas admitted at trial that he had access to those accounts and statements as of the petition date. He also testified that when they were originally preparing their bankruptcy schedules they had access to the bank account statements showing the transfers to relatives. He did not claim that any of the transfers were made without his consent or knowledge. The court, therefore, finds that the Debtors' assertion that they had forgotten about their overseas transfers, transfers that by their nature are harder to discover by a trustee, is not credible.

The circumstances also show that the $2,000 security deposit with the Eshlemans was something else that the Debtors would not have reasonably forgotten. Question 3 to Schedule B clearly and expressly asks for "Security deposits with public utilities, telephone companies, landlords, and others." (ECF No. 1 (emphasis supplied).) The Debtors admitted at trial that after the November 2012 meeting with bankruptcy counsel, they began prepaying their rent to the Eshlemans months in advance in a conscious effort to keep funds away from creditors. Clearly, the Debtors were aware of the term of their lease, scheduled to end on September 30, 2013, during the months before the filed their petition in August of that year. They moved to a new address in October 2014. With the lease for their then residence scheduled to expire less than a month after the petition date and facing the need to move to a new home in a matter of weeks, it strains credulity that the Debtors were not aware of the terms of that lease, including the

provision for the security deposit when they filed their bankruptcy.

Finally, the testimony shows that the bonus and other income Dr. Urbonas received from CGH Medical in early January 2013 was not the type of event easily forgotten. Dr. Urbonas mistakenly received eight to ten weeks of regular salary payments between January and early March 2013. Dr. Urboniene testified at the 341 meeting that they noticed the salary overpayments in March 2013 and that she physically went to a bank in Aurora to repay them. The unusual nature of the incident and Dr. Urboniene's memory of it at the 341 meeting, and that the overpayments and discovery occurred during a period of time when the evidence shows that the Debtors were highly focused on their finances, all show it to be most unlikely that they would have forgotten about the January bonus at the time of their bankruptcy.

These are highly educated debtors – one with a medical degree and one holding a Ph.D. Although English is not their first language, both have published articles in English in medical journals. Dr. Urbonas also testified that he is fluent in English. Also, as noted in *Katsman*, at least where a debtor is represented by counsel, it "be[speaks] a reckless indifference to truth" for a non-native speaker not to seek advice of counsel if the debtor does not understand the legal meaning of a term necessary to accurately complete schedules. 771 F.3d at 1050. Well before they filed their petition these Debtors were receiving the advice and counsel of experienced bankruptcy counsel.

Nor was this a hurried or emergency bankruptcy filing. The evidence shows that, after the foreclosure proceeding completed in November 2012, nine months before the bankruptcy proceeding, no creditors were actively seeking to enforce their debts. The Debtors did not suggest that they were being harassed by their creditors during this time. Indeed, they were not

only current on their car loan – their only secured debt – and residential lease, but were pre-paying both months in advance. Having been actively preparing for the bankruptcy over the course of nine months, the Debtors cannot credibly lay blame on their failure to fully disclose their assets and transactions to there being insufficient time to prepare their schedules.

The Debtors ask the court to believe that two months after the June heart attack and after completing cardiac rehab Drs. Urbonas and Urboniene remained so distracted by his medical issues that they could not fully and accurately answer the simple questions about assets and transactions that they were required to supply. The Debtors' testimony about their stress over Dr. Urbonas' medical condition under the circumstances is simply not a plausible excuse for the omissions in their schedules or testimony at the 341 meeting. His emergency hospitalization and surgery in June 2013 no doubt was an extremely difficult and stressful period for both Debtors. However, while Dr. Urboniene took the time to consult with bankruptcy counsel at that time, the Debtors understandably did not commence the case then. Regarding the events surrounding the actual filing of their petition, the evidence shows that Dr. Urbonas' August 2013 arrhythmia, while serious, provided some cause for some relief in that the device implanted in June functioned as its was supposed to and Dr. Urbonas' heart rhythm returned to normal without need for hospitalization or further treatment. Indeed, less than two weeks later, his physician cleared Dr. Urbonas to return to work as a hospital physician. Two days after the incident, the Debtors met with their bankruptcy attorney to finalize and sign their schedules and cause their petition to be filed. Days later Dr. Urbonas took up again his work as a hospital physician. And even if stress and distraction attributable to the August episode over those two weeks were a credible explanation, they do not explain the Debtors' later false ratification of their schedules and failure to disclose their omissions while under oath at the 341 meeting of creditors that took

place approximately one month after Dr. Urbonas had returned to work. Nor does it explain why it took an additional month and a half after the 341 meeting for the Debtors to file their first – of many - amended schedules.

The fact that the Debtors eventually amended their schedules does not excuse their earlier omissions or demonstrate that the earlier omissions were not intentional. An amendment will not necessarily cure a false oath. As the Seventh Circuit has noted in the context of a Section 727(a)(4) action, the "operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *Stamat v. Neary*, 635 F.3d at 982 (citing *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir. 1985)). The Chapter 7 trustee, the U.S. Trustee and creditors depend on the disclosures that debtors are required to make under Section 521 in order to determine what assets should be pursued and whether actions should be taken in the bankruptcy case – many of which decisions must be made within short statutory deadlines. The submission of accurate, indeed truthful, amendments late in the case rarely can be counted on to remedy the risk of confusion, delay, undue burden and unjust results that likely will arise from omissions and misrepresentations in the schedules and the testimony provided at the outset of a bankruptcy case.

Additionally, the amendments here were far less voluntary than the Debtors now suggest. The record reveals that most of the amendments were made only after deadlines had passed or the trustees had commenced their investigation into the Debtors' omissions. This circumstances of this case markedly contrast with those presented in *Rutile v. O'Neill (In re O'Neill)*, for example, where the court found that the debtors did not intentionally disclose information, in part

based on the fact that the debtor had taken "steps to amend his filings to correct them prior to conclusion of the Meeting of Creditors." 468 B.R. 308, 332 (Bankr. N.D. Ill. 2012) Here the Debtors did not file their first amendments until October 30, 2013, nearly six weeks after the meeting of creditors concluded, over a month after the Chapter 7 trustee filed her report of no-assets and one day after the U.S. Trustee filed his conclusion based on review of materials submitted by the Debtors that he did not presume their case to constitute an abusive filing under Section 704(b)(1). Even that initial amended schedule was rather incomplete and misleading, as it simply listed additional unsecured claims of two creditors who allegedly issued bills after the petition date. The next amendments were not filed until after the U.S. Trustee was granted leave to conduct Rule 2004 examinations of the Debtors and had issued subpoenas for the production of documents. Indeed, it was not until months after the U.S. Trustee filed his adversary complaint that the Debtors amended their schedules to disclose the security deposit with the Eshlemans or their savings account at Fifth Third Bank, to properly disclose their equity in the 2008 Jeep Grand Cherokee, or to disclose that they had moved within three years before the petition from the Chicago townhome. They have not credibly explained their delay in doing so.

Moreover, the piecemeal approach taken by the Debtors, dribbling out the omitted facts in multiple amendments filed over the course of one and a half years strongly suggests that either the Debtors were intentionally choosing to disclose information only after its discovery or likely discovery by the U.S. Trustee and Chapter 7 trustee, or a pattern of reckless disregard for their obligations to disclose all the information required from them and to assure the completeness, truth and accuracy of their schedules and disclosures. This is not a case of a debtor who under exigent circumstances is forced to prepare schedules in a hurried manner. The doctors are not *pro se* debtors who initially misunderstand the information requested in the schedules and later

correct it. Before the court are highly educated debtors, professionals who well before they commenced this case sought the advice of and were represented by experienced bankruptcy counsel.

Most probative is the way the Debtors amended their schedules to disclose the transfers to family members. Question 7 to the SOFA calls for the disclosure of all gifts made within one year prior to the commencement of the case "except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member." By excepting ordinary gifts to family members of less than $200, the form makes clear that all gifts to family members aggregating more than $200 must be disclosed. Yet the Debtors initially answered this question by marking "none" despite having made over $30,000 in transfers to family members during the previous year for no consideration, most of which were to overseas relatives and after meeting with counsel to discuss "asset preservation." These were cash transfers with each recipient receiving at least $1,000, so there could be no mistake that the value of the gifts to each exceeded $200. Although four of the eight unscheduled recipients were the Debtors' children, the Debtors testified that they were adult children, did not live with the Debtors, and the Debtors have never in the bankruptcy case asserted them to be dependents, including in response to the question on dependents in Schedule I.

On November 13, 2013, the court ordered the Debtors to produce within a month to the U.S. Trustee relevant documents concerning their assets and transactions covering the period of January 1, 2012, through October 31, 2013. (ECF No. 30.) The production order included complete copies of all bank account statements, either foreign or domestic, and copies "of any and all documents relating to the debtors' transfer of funds to friends or relatives for any purpose during the period of December 1, 2012, through August 8, 2013." Despite this and the trustees'

specific inquiries about their transfers, the Debtors did not begin to amend their schedules to disclose such transfers until January 2, 2014, and even then in a notably incomplete and misleading fashion.

On January 2, 2014, the Debtors through their bankruptcy counsel amended their SOFA to list add only two of the smallest and most recent transfers to family members, namely Dr. Urboniene's two $800 cash payments to her mother-in-law and brother during her trip to Lithuania in May 2013. (ECF No. 34.)  Not only did this amendment fail to disclose most of the Debtors' transfers to family members, but it also listed these transfers in a particularly misleading way.  Rather than disclose the transfers as "gifts" in response to Question 7 of the SOFA, the amendment lists them under Question 3.a's category of payments to non-insider creditors within 90 days of the petition. But there is no dispute that Dr. Urbonas' mother and Dr. Urboniene's brother were not creditors. Similarly, it is clear that the mother and brother were insiders of the Debtors as that term is defined by the Bankruptcy Code. 11 U.S.C. §101(31)(A)(i).[9]  Question 3.a. serves to identify for the trustee and other interested parties any payments to creditors within the 90-day preference period which may be avoidable under Section 547 of the Bankruptcy Code.  But the payment to Dr. Urbonas' mother and Dr. Urboniene's brother were made 96 days before the petition date and outside the preference period for non-insiders.  Therefore, a party looking at the Debtors' response Question 3.a. in the amended SOFA might well be led to conclude that the payments need not be pursued as a potential preference.

Separately, Question 3.c. in the SOFA, calls for the disclosure of payments to insider creditors within one year of the petition date, such payments potentially falling within the one-

---

[9] Which provides that the term includes a "relative" of the debtor which, in turn, is defined to include an "individual related by affinity or consanguinity within the third degree as determined by the common law". *Id.* at. §101(31)(A)(i), (45).

year preference period for payments to insiders under Section 547.   Other than the mere

coincidence that a careful reader may find as to the similarity of Dr. Urboniene's mother-in-

law's last name and the Debtor's, the amendment fails to disclose that Aldona Urboniene or

Gediminas Cibiras were related to the Debtors.   Indeed, listing them under Question 3.a. rather

than 3.c., the Debtors indicate that they are not related and that these individuals are not insiders

for purposes of identifying potential preferential transfers.   It was not until the second amended

Statement of Financial Affairs was filed on January 22, 2014 and after the U.S. Trustee's

attorney had conducted a Rule 2004 examination of the Debtors that they properly disclosed the

transfers to Dr. Urbonas' mother and Dr. Urboniene's brother and additionally revealed the

Debtors' larger transfers to the six other family members in response to Question 7. (ECF No.

43.) That question calls for the disclosure of gifts made within one year pre-petition; the related

Question 10 requires disclosure of other transfers out of the ordinary course within two years of

the petition.   Both of these items attempt to identify fraudulent transfers subject to Section 548 of

the Bankruptcy Code.   Despite this, the second amendment and even the Debtors' third amended

SOFA, the latter filed on February 3, 2015 (ECF No. 79), contain no entry in the column calling

for the identification of the "relationship to debtor, if any" for each of these transfers.

The evidence presented to the court clearly reveals that this case is not one of innocent or

excusable mistakes made in rush or confusion.   Even when serious omissions were identified to

the Debtors by the inquiries of the trustees, the Debtors persisted in hiding their true

circumstances by making only minimal and largely incomplete changes to their schedules until

they were forced to do more.   Thus, the court concludes, as it must, that both Debtors each

knowingly or with reckless indifference to the truth made material false statements under oath

with fraudulent intent by failing to disclose income, assets and pre-petition transfers in their

initial bankruptcy schedules and statement of financial errors and by falsely testifying as to the accuracy of such statements at the 341 meeting of creditors.[10]   Accordingly, the Debtors will be denied a discharge pursuant to Section 727(a)(4).

## B. Section 727(a)(2) (Fraudulent Transfer, Removal, Destruction or Concealment)

For the court to sustain an objection to discharge based on section 727(a)(2), the objector must prove:

(1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition; (2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code; (3) that the act was that of the debtor or his duly authorized agent; (4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

*Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002) (citing *Lee Supply Corp. v. Agnew (In the Matter of Agnew)*, 818 F.2d 1284, 1287 (7th Cir.1987)).   Proof of harm is not needed to support an action under Section 727(a)(2). 284 F.3d at 793 (citing *In re Krehl*, 86 F.3d 737, 744 n.4 (7th Cir.1996) ("Yet so long as the debtor acted with the requisite intent under Section 727(a)(2), his discharge may be denied even if creditors did not suffer any harm.")). *See also In re Scott*, 172 F.3d 959, 968 (7th Cir. 1999).

Although the pre-petition transfers to relatives discussed above were highly suspicious given the timing and given Dr. Urboniene's admission at trial that the Debtors had prepaid rent and car payments for the express purpose of keeping funds away from creditors, the U.S. Trustee

---

[10] The U.S. Trustee sought in Counts I and III of the complaint to deny a discharge for both Debtors under Section 727(a)(4) for false oaths in their bankruptcy schedules and at the 341 meeting of creditors by failing to disclose assets, transfers and income. The U.S. Trustee also separately sought in Count II to deny a discharge to only Dr. Urbonas based on false oath by testifying at the January 15, 2014 Rule 2004 exam that he had "resigned" from his position at CGH Medical at the beginning of 2013 while at the 341 meeting he testified that he had taken a leave of absence. Because the court finds that the misstatements by both Debtors in their schedules and at the 341 meeting warrant denial of both Debtors' discharges under Section 727(a)(4), the court need not determine whether Dr. Urbonas's testimony at the 2004 exam with respect to employment independently supports a claim under Section 727(a)(4). *See, e.g., Mass. Cas. Ins. Co. v. Roe*, 93 F.3d 323, 326 (7th Cir. 1996) (court did not need to decide alternate ground that would lead to the same ultimate legal conclusion).

does not assert the pre-petition transfers themselves as grounds to deny the discharge under Section 727(a)(2). Nor was much detail about the exact circumstances of such transfers elicited at trial, such as what the funds were used for. Instead, the U.S. Trustee alleges that the Debtors concealed assets, including the Lithuanian pension and Swed Bank account, by failing to disclose them in their bankruptcy schedules or upon being questioned at the Section 341 meeting of creditors.

Concealment "includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known." *In re Marcus-Rehtmeyer*, 784 F.3d 430, 442 (7th Cir. 2015) (quoting *In re Scott*, 172 F.3d 959, 967 (7th Cir.1999)). As discussed above, in their initial bankruptcy schedules and at the 341 meeting of creditors the Debtors withheld information about income they received in January 2013, and their right to receive a tax refund from amounts withheld from such income, the Swed Bank account, Dr. Urboniene's Lithuanian pension, the amount of secured debt encumbering their 2008 Jeep, their security deposit with the Eshlemans and their savings account at Fifth Third Bank.

Section § 521(a) of the Bankruptcy Code requires debtors to make information about all of these assets known in their schedules. *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) (Debtors have an "absolute duty" to report whatever interests they hold in property). Similar to an objection raised under Section 727(a)(4), to foreclose discharge under Section 727(a)(2) the objector "must establish, among other things, that the debtor intended to deceive her creditors" or the Chapter 7 trustee. *In re Rothermel*, 274 F. App'x 486, 488 (7th Cir. 2008) (citing *In re Kontrick*, 295 F.3d 724, 736 (7th Cir.2002)). The exception to discharge under Section 727(a)(2)(A) "consists of two components: an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *Kontrick*,

295 F.3d at 736. As in the case of Section 727(a)(4), fraud is rarely admitted and therefore for subpart (a)(2) cases, too, "intent may be established by circumstantial evidence." *Vill. of San Jose*, 284 F.3d at 790-91 (citing *In re Krehl*, 86 F.3d 737, 743-44 (7th Cir.1996); *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir.1989)).

For the same reasons discussed in the prior section, the court finds that the Debtors intentionally concealed assets by failing to list them in their schedules with an intent to keep the property away from the Chapter 7 trustee and creditors. The Debtors had already applied each of their $4,000 "wildcard" exemptions under 735 ILCS 5/12-1001(b) to other property, and therefore each dollar of value of concealed property was likely a dollar that would be available for distribution to creditors in the Chapter 7 case. The Debtors' explanation that they had forgotten about the Lithuanian pension and Swed Bank account into which pension payments were automatically deposited because the account and pension were located abroad is not credible considering that Dr. Urboniene had accessed the Swed Bank account and set up automatic payments for her brother from the account during her trip to Lithuania less than three months before the petition date. Instead, the weight of the evidence suggests that that the Debtors chose not to disclose the foreign account and pension because they believed it would be unlikely that the bankruptcy trustee would discover the foreign assets. Similarly, the Debtor's explanation that they forgot about the security deposit with the Eshlemans is not credible. The term of the lease was to expire less than a month after the petition date, and the Debtors testified that they had been prepaying rent to the Eshlemans months in advance since November 2012 in a conscious effort to keep funds away from creditors.

Nor is it believable that the Debtors simply forgot the approximately $16,000 bonus that Dr. Urbonas received from CGH in January 2013. The fact that CGH mistakenly paid a weekly

salary for the first ten weeks of 2013 that the Debtors repaid pre-petition should have made the January bonus payment more memorable than regular payments. The Debtors would have had to have looked at the early 2013 paystubs carefully to determine what amount had to be returned and what amount they could keep as a bonus from 2012. While it is plausible that Dr. Urbonas may have had doubt about whether to treat the payment as attributable to 2012, when it was earned, or 2013, when it was received, for purposes of the Statement of Financial Affairs, the Debtors failed to initially disclose the payment as income in *either* year. They also failed to ever disclose their right to a tax refund in part attributable to money withheld from the January 2013 bonus payment in their Schedule B, despite questions in the form schedule specifically asking for either liquidated tax refunds (Question 18) or contingent and unliquidated tax refunds (Question 21). The primary asset that the Chapter 7 trustee was eventually able to recover in this case was the Debtors' 2013 tax refund, which she was able to intercept.

Accordingly, the court finds that the U.S. Trustee has demonstrated by the preponderance of the evidence that the Debtors concealed assets of the estate subsequent to one year before the date of the filing of the petition with actual intent to hinder, delay, or defraud an officer of the estate charged with custody of property under the Bankruptcy Code. For this reason the Debtors also will be denied a discharge under Section 727(a)(2).

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors will be denied a discharge under both Section 727(a)(2) and (a)(4) of the Bankruptcy Code. This Memorandum Opinion constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure. A separate judgment order will be entered pursuant to Bankruptcy Rule 9021 giving effect to the determinations reached herein.

DATE: September 30, 2015            ENTER:

Thomas M. Lynch
United States Bankruptcy Judge